Good afternoon, Illinois appellate court 1st district court is now in session. The 6th division, the Honorable justice, a really good chance to keep residing case number 2, 5 dash 1, 2, 3, 5, WP Venture 4 LLC versus Luther village owners Corporation. Good afternoon everyone. I'm just a surveillance can with me. You see my colleagues, just as Michael Hyman, just to see again around before we start. We'll just make it clear that we've read all of the briefs, all of the information, the entire record and the cases that were cited. So, our recommendation, since this is a complicated cases that each of you get to the best point that you can make 1st and work your way down from there for the time that you have allotted before we get really into the meat of things. So, we need to have the attorneys who will be speaking, tell us who they are and who they're representing. So I see on the screen. The 1st person seems to be, I don't, I think it might be Peter rush. Are you representing? Yes, your honor Peter rush representing WP Venture 4. Okay, and next would be Alexander. Good afternoon justices Alexander on behalf of the village owners Corporation, which I'll refer to as. Okay, and then we have Jacob. Good afternoon justices Jacob burger on behalf of 3rd party defendant at the Lutheran home for the age incorporated. Okay, so we'll, we'll start 1st of all. Do all 3 of you intend to speak. Yes, your honor and as a housekeeping matter, I've spoken with Mr burger and we've agreed to divide the time. For WP 4. And then 6 minutes for L. A. J. Okay, that's great. Thank you. And your honor sorry, my apologies just to as a housekeeping matter, I would like to reserve 5 minutes of my 20 for rebuttal. If that would be. All right. Okay. Yeah, sure. Okay, so we'll start with Mr. Kasperi. Thank you justice and may it please the court at summary judgment presented evidence 3 critical facts 1st presented evidence that paid and accepted rent equal to 10% of the fair market value of the land on which Luther village was built from mid 2001 to 2018 for approximately 20 years. 2nd, in 2018 provided obviously a memorandum prepared by his own attorney and intended for his board stating that rent was calculated as 10% of fair market value and 3rd, in late 2017, it's more real estate broker to publish marketing that represented that was calculated as 10% of fair market value. The trial court generally acknowledge all of that evidence. The trial court also correctly projected WP 4 is bona fide purchaser defense given WP 4 new of the very mistake obviously later sued to correct specifically the court found that before could not be a bona fide purchaser as a matter of law because quote WP 4 inquired about section 3.02 of the lease and the rent calculation prior to the purchase and we're told rent should be calculated as if the fraction were 1. End quote, before the record shows, then subsequently bid on finance and paid for rental stream with rank calculated as equaling 10% of fair market value. Well, let me ask why should we let your client say in 2018 that the lease was correct? And then in 2020, you say the lease was wrong. So, in the certificates don't say any, first of all, the certificates do not say categorically one way or the other that how rent should be calculated. In fact, the certificates are facially ambiguous as to the calculation of rent while sections 1 through 3 could be read to suggest that the rent that could be read, I suppose, to say that the rent should be calculated as equaling 10% of fair market value. And then in 2020, you say that the lease was true and correct. And therefore, without any mutual mistakes, we don't agree that it should be read that way. But even assuming that the certificates could be read that way, section 5 of each certificate represents that rent monthly rent is equal to a fixed value that fixed value in both certificates is equal to 112th of 10% of fair market value. In other words, the established certificates are ambiguous as to how rent should probably be calculated because the established certificates themselves are not clear as to the amount or how rent should be calculated. Even if we accept the reading that the trial court made, which is that the established certificates can be read as representing that are implicitly read as representing that. How rent should be calculated, we have another provision in section 5 that makes an explicit representation as to the amount of rent and that amount of rent is equal to 112th of. You still wanted to reform the lease because you say there was a mutual mistake. Correct. All right. So my question was, how does that relate to the establishment? Well, the case merchandise Mart and the other cases cited in the party's briefing make clear that a established certificate can only foreclose a claim if it is inconsistent with that claim and it has to be clear from the established certificate that it is clearly contradictory to the claim. The point that I was trying to explain was that the established certificates here are not clear as to how rent should be calculated and are not clear that the lease does not contain a mistake because they implicitly represent, or at least can be read to implicitly represent, that rent is calculated as 10% of fair market value. Now, the one term in the established certificates that make any specific representation about rent states that rent is equal to an amount. In 2017, I think it's roughly $80,000, $90,000. In 2019, it's roughly $150,000. Both those amounts are equal to one-twelfth of 10% of the fair market value in effect at each of those moments. So the established certificates themselves support, or at least can be read to support, LVOC's claim that rent was equal to 10% of fair market value and, therefore, they cannot contradict LVOC's later reformation claim and, therefore, can't preclude them. The fundamental error that the trial court made was that while she was focused on paragraphs 1, 2, and 3 of the established certificates that make general representations about the lease, she failed to take into account the representation of paragraph 5 of the lease that is the one specific representation of the lease regarding rent. Let's take a step back. The most important thing in this transaction was the amount of rent and how it was going to be calculated. WP4 was purchasing from LHA, the rental stream that LVOC was paying to LHA. That was the deal that they were interested in making. And so did they actually know that that was the stream? And then somebody read the contract and there were questions raised before the estoppel letter, correct? Well, there's evidence in the record that shows that WP4 was explicitly told to assume that the fraction in the lease was one and that rent was calculated as 10% of fair market value. No time did your clients prior to 2020 say anything other than 1%, is that correct? Sorry. We never made any representations regarding what the fraction was equal to. Never made any representations only that they could go on the contract? So LVOC never made any representations to WP4 other than the estoppel certificates that were signed. And as WP4 points out in their briefing, the estoppel certificates were procured for WP4 by LHA. So the estoppel certificates, those are the only affirmative representation. But LHA knew it was 1% for the last several decades. LHA certainly knew that for two decades that LHA had been paying – sorry, let me restart. LHA certainly knew that for the past 20 years that LVOC had been paying rent equal to 10% of fair market value. In fact, LHA's own attorney in late 2017 prepared a memorandum for LHA's board that said rent was calculated as 10% of fair market value. In fact, that attorney actually attached a copy of Section 3.02 to the memorandum that he had prepared. That has colloquially been referred to as the Texan memo, Your Honor, and I'm happy to give you the specific site for that memo. But in 2017, LHA's own attorney was telling its board that the fair market value was 10% times fair market value. Thus, it's no surprise that when WP4 inquired of LHA, or it might have been CBRE, its real estate broker, of what the rent calculation was, they were told, assume the fraction is one, assume rent is equal to 10% of fair market value. That's what – sorry. I understand that. So, excuse me, looking at this, what are the issues? Where are the parties on this issue? It seems that WP4 says that they purchased a contractual right to collect rent as per the lease, and your client says, no, they purchased the rent stream that LHA had been recognizing for decades. You and LHA were working for decades this income stream. Isn't that really what's at issue here? They want to say that the lease, by its very terms, whatever it was at the beginning, if it was misinterpreted too bad, we want to read it the way it could have been read. And you're saying, no, there's been a practice between the parties that's been substantiated, you just mentioned all those ways, for the last 20 years. Your Honor, I actually don't think it matters which of those is correct because our reformation claim is to correct, to go back and correct the lease and to give the parties the initial effect, such that even if WP4 says we get what we asked for, we get the lease, the lease would reflect what the parties originally agreed to, which is 10% of fair market value. It's not that LVOC is saying that WP4 purchased something other than it thinks it purchased. That's not what I said. I said they knew what they were receiving. They were receiving 1%. WP4, on the other hand, before the closing, they knew there was a mistake in there or maybe it wasn't a mistake, but they saw an opportunity to make more money in the lease. That's what I'm saying. The difference is they want to enforce the lease as written, right? They want to enforce, either reform it as a mutual mistake or practice over the last 20 years. Everybody agrees it was 1%. And the lawyers that were involved and all the depositions, everything else, it all showed that that's what was going on. I mean, I think at the bottom line, the key is that WP4 is not a bona fide purchaser. So they're not entitled to that defense. At the end of the day, what WP4 purchased was a rental stream as defined by a lease that contained a mutual mistake. We have now sued in response to WP4's attempt to enforce that lease. We have sued seeking to reform that lease. Am I correct that WP4 never raised this issue with your client until right before the second estoppel certificate? Correct, Your Honor. That is what the record shows, is that WP4 did not have any direct communications with LVOC until I believe it's roughly June of 2019, prior to the second estoppel certificate. So WP4 says, you know, they knew at that point and they still signed this estoppel certificate. That should bar them from their claim. So I think the key point, Justice McNamara, is that WP4 knew about the dispute and still chose to procure a estoppel certificate from LVOC that still said that rent was equal to 10% of fair market value. The 2019 estoppel certificate doesn't say anything about the proper calculation of rent. And that's despite Kay's Merchandise Mart's strong admonition that if you know of a dispute and there is no question that in 2019 WP4 knew that there was a dispute between the parties regarding the proper calculation and amount of rent, there's no question that they knew about that dispute. And yet they procured an estoppel certificate from LVOC that made a representation that rent was equal to an amount, a monthly amount, that is one-twelfth of 10% of fair market value. So in essence, there's no basis for LVOC to object to that estoppel certificate in the fall or late fall of 2019 because the estoppel certificate reflected what it understood was going on, that there was a copy of the lease attached to the estoppel certificate and that rent was equal to 10% of fair market value. I mean, sorry. Turning to the summary, unless there are any more questions with regard to the estoppel certificate, I want to turn briefly to the statute of limitations. Can I just ask you about this section 302? Section 302 talks about the $469,000 as being the denominator. The numerator is the square feet of units on which rent is accruing. And it turns us to Exhibit C. Exhibit C is also roughly $649,000, and it only includes the Phase I buildings. It doesn't name Phase II. So looking at this lease, how would one even know that this project has 700,000 square feet and these two other buildings? Your Honor, frankly, there isn't a way to just look at the lease and know that. You have to do a significant amount of work. You have to do a significant investigation to figure out what rent should be, which is why we suggested in our briefing that what we think happened is that a price per square foot was calculated, or one of the things that could have happened was that a price per square foot was prepared and that that was what was used to calculate rent going forward. Frankly, Your Honor, as we admit, and as we admitted below, the record is wholly unclear as exactly how LVOC calculated rent in 1998 and 1999. And as you just noted, Justice Gamerath, the lease itself is very difficult to figure out the fraction from just looking at the lease. In fact, I'm not convinced that you can do it without doing a significant amount of work. And there's simply nothing in the record to suggest or that shows that LVOC ever did that work. There's no spreadsheet. There's no memorandum. Nobody testified that they calculated the fraction. There's simply just an absence of evidence. Mr. Kasperi, you're running out of time, if you could. Yeah, I'll leave the rest of my time for rebuttal, but I just want to leave the court with two quick things. At the end of the day, this appeal turns from the answers to two questions. First, where there are no questions of facts, as a matter of law, the LVOC knew or should have known that there was an error in the lease prior to September of 2010. And second, can the 2018 and 2019 established certificates be read as contrary to LVOC's reformation claim as a matter of law? Because the answer to both those questions is no. The trial court summary judgment order must be vacated and this case remanded for trial. I will see you all on rebuttal. Thank you. Next, Mr. Rush. Thank you, Justice Paczynski. May it please the court. The first thing is you were told several misrepresentations that there was a dispute between LHA and LVOC as to what the rent was in 2018. There was none. There was an explicit hiatus agreement that dictated what the rent would be and actually wrote the number in it. So when the appellant says WP4 knew all about the dispute and the mistake, there was none. There was no dispute. It is true that the hiatus agreement deleted the multiplier fraction for 10 years. Mr. Rush, where is that hiatus agreement? I read you describe it that way, but is there any document that talks about a hiatus agreement? Actually, yes, there is, Your Honor. First, I think it's attached to the verified complaint as exhibits. I can't remember which one it is. They have it as an exhibit. It's executed by the parties. I'll get the reference for you and provide it to you, but it's literally it is attached to the verified complaint, which means it's real. We also have the deposition testimony of Pastor Abramson and Poulsberg with regard to that hiatus agreement, and they actually signed it. Their signatures are on it. Is this the agreement where they agreed to compromise the fair market value? It is, but I'd also point you to the Pearson memorandum. The Pearson memorandum, which was from 2017, and is part that the parties did not utilize the multiplier fraction from 2009 forward. That was the effect of the hiatus agreement. Now, the reality of this is this was caught by WP4 and several other bidders. Several other bidders realized that LHA and LBOC were not calculating rent in accordance with the rent formula 3.02. They demanded an answer. They not only demanded an answer, but CBRE demanded an answer, and what CBRE got was the hiatus agreement. They said this is why the rent for 2009 and 2018 doesn't match the unambiguous terms of the lease because we have this special side agreement for this 10-year period. Go ahead. The hiatus agreement, as I see it, is the one that compromises on the fair market value and says 10%, correct? This was in response to LBOC saying, hey, times are tough. Can we go down to 7%? And your fair market value is too high. Is this what you're referring to? Yes, and they asked for a break on rent.  And break on rent came out to 10% of fair market value, which by definition means that was not the agreement that existed between the parties. Is that really correct? I mean, they compromised on the fair market value, and then the landlord says, no, it's 10%. Can you really say it wasn't so? LBOC said, can you give us 10%? LBOC said 10% is too high. Can you give us 7% or 7.5%? That was rejected. So I didn't see anything in there that said, but we'll still give you a break and give you 10%. The break was on the fair market value. Did I need to explain? Yes, the March 23 letter written by Bill King in 2009 said the current return at this $1,045,000 figure is 11.5%. And that was not, quote, the true intent of the parties. LHA rejected that. They said there is no cap, but we will give you a break. If you read the testimony of Mr. Renetsky, Mr. Palsberg, and Pastor Abramson, they all said it was a rent concession. And even the memorandum from the Pearson memorandum says exactly that. The multiplier fraction was not utilized. That was the discount. It was not utilized in 2009 to 2018. Now, WP... You misspoke, I believe, because I have a letter in front of me. And that is not what Mr. King said. If I have the right letter, which is dated March 23, 2009, I believe is what you said. Right. And it says, I do not believe this was the intent. You said he did not believe that was the intent. That means it could have been the intent. He said he did not believe that was the intent. Right. He did not know, but he is saying he did not believe it. That does not mean it could be the intent. So it was not as if LHA rejected it. When you go, I do not believe it was, maybe it was, maybe it was not. That is how I get at it. They settled on a number that was higher than 11.5%. 11.6. Didn't Mr. King also testify that 1998 was an overpayment due to an accounting error? And they tried to correct it the next year. It was really kind of unclear. But, of course, we are not here to decide facts, nor was the trial court. The question is, is there enough to create a genuine issue of material fact? So with King's letter, in light of his testimony, that the rent was an overpayment due to an accounting error, can you really take that as a firm, clear hiatus agreement? You are mixing, I think, Justice Amroth, you are mixing years. 1998 and 1999 is not subject to the hiatus agreement. In 1998 and 1999, rent exceeded 10% of fair market value. So when rent exceeded 10% of fair market value, that is what we know as one of the instances in which LVOC knew or should have known that the rent formula did not have a flat 10% cap and did not change when phase 2 came in. Because they alone calculated rent, and they alone calculated at 10%. And in both of those years, we have a graph that's included in our appendix. In both of those years, the rent exceeded 10% of fair market value. Both years at their calculation. And then, Your Honor, when they say there's no evidence, we don't know how rent was calculated, their argument for reformation here is a course of performance argument that everybody knew what was going on and agreed to do it. If they don't know how they were calculating rent, how could LHA have been complicit in that such to create a course of performance? Keep in mind, this is an extraordinary remedy of rewriting a lease 40 years after the fact. And at this point, that lease terms are unambiguous. Maybe what you're saying is some of each other is inappropriate. That's what I hear because there are so many issues here that need to be resolved because it's unclear. You just said something that's contrary to what's in the briefs. And that is that there was a stream for a couple decades of 1%. There may have been a little mistake, a hiccup once. But there seems to be a disconnect of what the facts are here. And so maybe it's appropriate then that summary judgment be reversed. No, Your Honor, this case begins and ends with the March 18, 2018 tenant estoppel certificate. No, no, no. Let me ask you about that. So the way you read the estoppel certificate is that if there was a mutual mistake, it can't be corrected. Is that right? No, no. Your Honor, I looked to Excelsior Garage. Excelsior Garage says the purpose of a tenant estoppel certificate is to ascertain what possible claims the tenant has against the landlord. It's to smoke that out, to fish that out. So they didn't know of any claims because they were under a mutual mistake. And you knew, your client, you knew that it might be a higher amount under the lease. So you had information that they didn't have. Would you agree to that? Oh, absolutely not. Absolutely not. All right. Well, maybe that's why we need to have a trial. No, you don't need to have a trial. What they knew was they had a hiatus agreement that set the rent. Did the word hiatus appear in that agreement? Where? The tenant estoppel certificate? No, no, no. You should keep talking about this hiatus agreement. Is that what it's called? Yeah, that's what it was testified to by Roger Postman. But it doesn't say hiatus. Somebody testified to that, but it didn't say hiatus. No, that's how he described it. He described it. So it doesn't say hiatus. That's somebody's impression. People have nicknames for things. Call it a side deal. Call it a side deal. Okay, call it something else. A special giveaway on rent. Call it whatever you want. It was a special side deal that expired in 2019. I go back to that. And where is the compromise on the 10%? Because the record seems to be the compromise on the fair market value, right? It is an admission that they're not following the rent formula. And if I can, Your Honor, this seems to be the center of what we knew. And I'm going to point to you a document that's CS8842 to CS8845. This is the heart of this issue. This is an email from Jeff Whaling in January 11, 2018. Quote, this was after he'd been provided the hiatus agreement by CBRE. This is what he wrote. We should talk to a lawyer about if the past precedent of not following the formula laid out in the lease for the previous rent reset could have any effect on us. Now, the product of that was Mr. Whaling took that to the lender's lawyers at Mayor Brown and Platt and asked the lender's lawyers, we don't know whether we want to buy this. Does this side agreement, this rent concession, this hiatus agreement, does this change the terms of the lease? And it was Mayor Brown and Platt that said, Tenant estoppel certificates are critical to commercial transactions. And you need to get the lessee to tell us all the claims he has against the lessor and whether this document amended the lease. Let me just stop you. The estoppel certificate was something that was in the lease. In other words, didn't LVAC have to sign it or face defaults? Your Honor, prior to this, the tenant had to pay the landlord for tenant estoppel certificates and the landlord had provided them. So, yes, it is a provision that works both ways. Sure, sure. So, your estoppel certificate that you provided to LVAC was consistent with their obligation under the lease, which said, if you're presented with this, here's what you need to sign or you face default. How do you reconcile what counsel just said when they wrote in what the rent was, which was 10%, and they affirmed that nobody was in default? So, they write in 10%, you see it, you take that certificate, and you, too, presumably acknowledge nobody's in default. Several points, Justice Gamer. We can't request the tenant estoppel certificate. We were not the landlord. The landlord requested the tenant estoppel certificate and the bank wanted the tenant estoppel certificate. We were agnostic, so was the bank. The purpose of the tenant estoppel certificate is for LVOC to tell what they wrote in the Pearson memo, whether they have any issues with their landlord, whether they think the lease has been amended, whether they think it's in full force and effect, whether they think it's true and correct. The Pearson memo said it had never been revised. The language had never been revised and that it was a mistake. This was their moment to speak and they didn't. Oh, but you knew there may have been a mistake there. We did not. Well, apparently you did. Apparently you did because that's why you had Mary Brown and Platt involved. I don't see how you can say this. We knew there was a side agreement. We'd been provided a side agreement. Something here that could be fishy and doesn't meet the eye. And you saw an opportunity. I saw some of the correspondents indicated that there was an awareness on your part that there was something, a disconnect between the lease and the 1%. Therefore, you had an idea, you get that estoppel letter, and it's questions before us. If we reverse on the estoppel letter, is there any way that you win? What would be the fallback position? Well, first, Your Honor, if they'd have been. Answer my question on that. I don't want to go back to this. I'm asking if you have a fallback position. We went on the statute of limitations. We went on latches. We went on waiver. We went on. Well, but they see under that, they didn't even know that there was a mutual mistake. That's a question of fact. We tried. Here's how we went with the statute of limitations and the other issues, latches and so forth. Yeah, but there's a complete failure proof. They need contemporaneous evidence of this supposed mistake. And they never raised it. They have a payment for decades at 1%. That's not contemporaneous, Judge. It has to be contemporaneous to 1989. The evidence they're offering you as the course of performance under their own admission doesn't start until 2002. 13 years after the lease was signed and negotiated, after the principal negotiators are dead. That's the course of performance. There's an. I don't know. That could be an issue for the trial court to have to decide, because that's your position. They're also. They're also supposed to provide the language that's missing. They still haven't done it. And in the reply. That's your position. Well, I can show you points in the reply brief where they say two different things. So the question is, which one's the chancellor supposed to say? And if this really was an agreement that was entered. 35 years ago. Why don't they know what it today, what it was supposed to say? Because there was a mutual mistake. You seem to, you don't want to acknowledge. The fact that the position. Their position is there was a mutual mistake and that some way you, if I understand your argument correctly, because of a stop, well, they are unable to raise the mutual mistake. I don't believe that's the law. No. Because the estoppel certificate, that's exactly what it does. It's supposed to get clarity and had that we were agnostic. If they came forward and said, we don't have an agreement on rent. There would have been no loan. There would have been no train. I didn't know that. I didn't know that you could say. The Pearson memorandum confesses that they knew that it was written in March of 2017. It's a year, a year before the tenant estoppel certificate. And it says the word mistake and written onto it. And it says the lease formula has never been revised in 2019. Attached to their complaint. They included a document. It's a 45 of the appendix and C 1662. This is what they said. The way rent was calculated for the first 13 years. I'm going to read it. Calculation of rent in the earlier years. 10% of fair market of the demise land. Times total square feet of the units. Computed divided by four 69. Oh 98. This was the formula used until 2002. That's the formula. That's the way it was written. That's the way it was applied for 13 years. I, my position is under the discovery, under the execution rule. And it was, it was a literary application of the formula. It was a literary application of the formula. But under a course of performance, the course of performance was a literal. Application of the black and white terms. Of the rent formula. For 13 years. And it was LVOC that applied it. And. But the numbers. Don't really support that too. Because if they use that. If they use that number. And. Then they would have been overpaying 10%. But they've been paying 10%. No. It's actually untrue. There were those couple of years that were. 11 and one was 12. But by and large, it was roughly 10%. And. So. So. She calculated rent without ever looking at the lease. So I don't disagree. That they weren't following the lease. I would point out that the 39th amendment. Wasn't signed until. May of 2018. I don't know what they were doing. And to LVOC's credit and their reply. They admit they don't know how they were calculating rent. They don't know where they came up with these numbers. But if you, this court is being asked to reform a lease. Based on a supposed. Mutual course of performance. For which the evidence is lacking. I don't, I don't know how you get there. Okay. Stop there. That's not what we're here to do. We are here on. Finance questions. Summary judgment based on statute of limitations. And these. Certificates. We are not touching. Affirmation. We're looking is there. Material fact. On those two. Correct. Because those were your defenses. So. I think. If we were to reverse. Summary judgment on those points. I think. You know, there's still a long way to go. Before reformation kicks in. But I just want to make that point clear that we are. Here on those two points. Okay. Statute of limitations. And has stopped. We've advanced a third point. And that's a complete absence of failure proof. Which is admitted in the reply brief. If they're going to make a course of performance argument. They have to submit evidence of the course of performance. What they are telling you and what you just heard 15 minutes ago. Is we can't tell you. What the course of performance was for two years. We don't know how we were calculating it. We don't know how we got to these numbers. If they don't know how they got to these numbers. How can that be a constant course of performance, which creates. An impossibly unavoidable conclusion that everybody agreed. It was good. If nobody knew what they were doing. So, no, we don't. Yes. Thank you. If you could just wrap it up. Okay. The point is on the tenant estoppel certificate. The law of Tom's all the law says. When a tenant gets an estoppel certificate, they're supposed to say. All the claims they have. And what any issues they have with the lease. They did not say that they said the lease is true and correct. They said it's in full force and effect. They said it's never been modified and they didn't list any claims. In the Excelsior case, the first district reversed. Because it says the whole point of this. Is for the lender to find out. If the lessee has a challenge to the income stream. And in this case, based on the Pearson memo. They now claim they had a challenge. To the income stream. And they didn't raise it. They were quiet. If you can come back later. And obviate the tenant estoppel certificate, Illinois. By saying, oh, I, I did. I thought of something new and this was a mutual mistake. And King's X, there is no tenant estoppel certificate. You'll never get another loan. There won't be any commercial transactions. That was their moment to speak. They didn't. Had they spoken. None of us would be here. Why? Because a lease. Without a rent term. It's not a lease. It's not marketable. It's not lendable. It's not. Okay. They told you in the. Certificate. What the. And we just heard from counsel. It was one 12th. Of 10%. They also put in. Certificate. They were not in default. So how do you reconcile that? They believed they weren't in default. They believe the. They believe the lease was amended. And the rent was 10%. So therefore. No issue. And they couldn't have said the lease was amended because it wasn't. That's correct. You're right on everything, but one point, your honor. And that is the tenant estoppel certificate. It's a snapshot in time. It concludes a raw number. And Tom's and I believe it's a. Urban site says you don't inquire behind the number as to. The machinations that got into it. And do you know why that number? Was not a default in 2018. Because that's the number from the hiatus agreement. The side deal, the concession agreement, whatever you want to call it. It's not a default. Because they gave them a concession on rent for that 10 years. The question we had. And the question mayor Brown had was. Did that change? 302. And the unequivocal answer in the tenant estoppel certificate. Was no. No. And the unequivocal statement. In the Pearson memorandum was. This has never been revised. It's still there. I just want to read to you. Okay. This supposed hiatus. Which says. We confirm that. We have approved the fair market value of 10.9 million. Period. On November. The ground rent will be calculated. At 10% of the 10.9. Period. Correct. And when does that agreement? 2019.  What happens after that agreement? Did they amend the lease?  When they hit. But this was. Well, I think there's two sides to this. Because in my view, based on the record. And of course, on into the parties. The compromise was on the fair market value. That's fine. Your honor. But whatever it was. It was over on 2019. And there's no debate. Among any of the parties here today. That document. Didn't rent. Amend the black and white terms of the lease. And the rent formula. So no matter how. Even if they said. 15%. It still would expire in 10 years because the lease. You have to do a fair market value.  And that's what they're going to do every 10 years. Well, whatever this side agreement. It's they never listed it as an amendment. Nobody thinks it's an amendment. It had a finite life. And so when you say, well, you finance this at one to one. It's because that agreement. Obviated the multiplier fraction. And when you walk into a bank. With an agreement that says, this is the amount of pay you're going to get. That's all you can finance at that moment. You can't look forward and say, I think this is going to be a whole lot better in three years. The bank says. How are we going to service the income stream now? And all attended to stop a certificate does is put a snapshot in there. It's up to the tenant to say. There's no rent formula. Come stream. And on 2019, we don't have an agreement because I have a reformation. And how do we know they knew they had a reformation claim? The 2017. Which said the language has never been revised. The multiplier fraction is still there. And we didn't utilize it when she says it's not. Utilized in 2009. It can't mean anything other than the hiatus agreement. Which is dated 2009. And which, as you stated, expires in 2019. A year and a half after the tenant to stop. All bets are off after that. We don't know what rent is going to be. There could be a market crash at the building to get condemned. You don't know what rent's going to be. We do know rent's going to be that number in the blank. Until the. And when all the bidders. Inquired as to why. That number didn't match section 302. They were all given. The hiatus agreement. And if you want that email. I'll provide that to you. Oh, I have it. Thank you. I know your weight has your time, but I do have one more question. And that is. Section 302 refers you to exhibit. Correct. Exhibit C. When you add up those figures is roughly 469. And it's the stuff size. The. I'm sorry. Phase one unit. It does not specify those two. Mid-rise buildings on phase two. So I asked. Appellants council. How would we even know that this is 700,000 square feet? Or that these phase two units were supposed to be calculated. Because CBRE put it in their offering. Well, whatever. Doesn't change this lease. No, it doesn't. Also told you point blank. Assume it's one and it's 10%. Yes, because if you're going to finance this deal. In March of 2018. It's one. It's 10% to one. Because the parties didn't. Utilize. The multiplier fraction. Just like Pearson. McGrath. And you to Paul wrote. It's not in there. So, yes, your honor. It was all financed on that. Because I can't tell you what my income is going to be next year. I can't even tell you what it's going to be this year. I can certainly tell you as a fact what it was last year. And so when I go to the bank to get the loan. That's the only number they want. They don't want me to tell them. I think it's real. I'm having a great year. They want to know. What's your income stream? And are we going to have a surprise? That's the word the Excelsior court said. No surprises. And it's up to the tenant to prevent. There's no surprises. The Pearson memo. Demonstrates. They thought. It doesn't even say that. It doesn't even say there was a mutual mistake. It says the lease is written as a rent formula. And it's never been revised. At that moment. That's if they believed. The multiplier fraction was gone. And should be taken out of lease. That's exactly what the lender wanted. That's exactly what we wanted to hear. If they said that. Everybody leaves. They say we don't have a rent provision. We don't have a rent provision. We never came to an agreement. All they had to do was write that. Just attach the Pearson memo. And there's no deal. The case goes away. Nobody's trying to pull a fast one. We wrote an email and said, we can see there's a discrepancy. Is this a problem? And mayor Brennan Platt. Who does hundreds, maybe thousands of these years said, no, the way you handle this, you should get a tenant to stop. That was you going to your counsel. This was not you. Or. This was not us going to our council. This was. Mayor Brown didn't represent. They represented the bank. Yeah. Yeah. I think you're past your. The tenant estoppel certificate. It's for the bank for the lender. And this was the lender's lawyer saying. Get a tenant establishment. Thank you. We appreciate it. Mr. Berger, thank you for your patience. Thank you. Justices. And may it please the court. My name is Jake Berger and I represent the Lutheran home for the H. In addition to the points that Mr. Rush from WP for race to trial courts, grant of summary judgment in favor of LHA and WP for should be. And in favor of LHA and WP for, and again, LVAC should be affirmed for three reasons. First, the 10 year statute of limitations on contract actions. As far as LVACs reformation claim, regardless of whether this court applied the execution rule or the discovery. Second LVACs claim is barred by the equitable doctrine. Lachey, which was one of LHA's affirmative defenses to the reformation claim. And third LVACs reformation claim also fails because LVAC cannot establish at least two essential elements of its reformation claim. The mistakenly omitted contractual term or that the mistake was mutual. Turning to the first. Before you get there. Is there anything that Mr. Rush said that you disagree with? Or do you adapt hook, Your Honor, I generally agree with everything he said. I believe that the estoppel certificates do bar the reformation claim. And I, I believe also that LVAC did not raise any genuine issues and materials back as to the course of performance. So I do adopt those arguments and I'll touch a little bit on the course of performance during my arguments as well. Turning to my first argument on statute of limitations grounds, Your Honor LVACs claim is barred by the 10 year statute of limitations concerning actions on written contracts set forth in section 13-206 of the Illinois code of civil procedure. The key question on the statute of limitations issue is when did LVACs claim accrued for purposes of the statute of limitations and under the execution rules set forth in the opinion case that we said in our brief LVACs claim accrued when facts existed that would have allowed LVAC to maintain a cause of action for reformation. Those facts existed in 1989 when the contract in section 3.0 Isn't that a question of fact, isn't that a question of fact? Shouldn't that be a fact inquiry? Your Honor, in this case, Noah as Sean's in the court's recent decision in Israel versus city of Chicago explained, this issue can be decided as a matter of law where the facts are undisputed and only one conclusion can be drawn from those facts. And with respect to the execution of the contract, it should have been clearly apparent to LVOC on the face of the contract that section 3.02 differed from its understanding of the agreement departments. But apparently it wasn't because there isn't anything in the record that shows that there was this disagreement and it came at it. If you look at what's in the record, it came as a surprise around the time that all the negotiations were going on with regard to the sale of the property underlying property. So for you to say, well, we're not going to look at anything afterwards when you only want to look at one spot. So you get your 10 years, but it seems to me that that is not the end of the question. You have to look at what happened after that as well to see how the parties acted and reacted. And if you look at the luminous materials, there's an argument that this should be heard by a trier effect to find out when they actually should have no. Respectfully. No, Your Honor. There's no tribal issue of fact in this matter, even if the court does apply the discovery rule for several reasons. First of all, LVAC could and should have discovered this error in 1989 on the face of the contract. LVAC does not claim there's a latent defect. LVAC does not claim it was misled early on to believe that rent was, could exceed 10% of fair market value. They're talking about a mutual mistake. So, so, you know, it's not just them. You're putting the onus on them, but it was, it's a mutual with regard to your client as well. So I understand why you're taking the position, but it seems that you can't just talk about them when it's what they're saying is a mutual mistake. And in any event, this argument is justice. Gamma said is. Well, I mean, as far as the reformation, it's great. It's separate, but, but there's digital limitations. It seems is a discovery role as I understand it. And if that's true, then it should be. Tell me why you think it should not be discovered. So if you're on a few reasons, first of all, the course holding in urban sites is critically important here. What urban sites says is that a party must read a contract, both before an execution, because it's charged with knowledge of this of the contract is charged with knowledge of the contractual terms, which means LVAC should have seen right there. And then in 1989 that the memorialized contract differed from their understanding. And you would never have a mutual mistake. Well, you're saying is never have a mutual mistake because you read the contract. How could there be a mistake? No, your honor. That's not what we're saying. What we're saying is that under urban sites and under the execution role, parties should read the contract early on. They should raise disagreements or issues. They didn't have a disagreement. And of course they read it. They've read it several times. I mean, you're saying your client. Didn't read it either. Of course they did. They were going over this contract over and over and it was, it was important for everything that we talked about all along the line. So, you know, did the say that they didn't read it or anything doesn't really sit well when you're talking about a mutual mistake. You can't be, you can't remove that. Your honor. I'm not saying that they didn't read the contract. I'm just saying for whatever reason, they did not. They had the opportunity to discover the mistake then and there both for the purposes of the execution rule and the discovery rule in 1989. But even when did your client discover it? Your honor, we were never told that there was any mutual mistake. Right. You didn't know. And that's exactly why it's mutual.  since the issue is a mutual mistake and that we're looking at the statute of limitations, it would seem that this is a question that has to be decided upon the facts. Your honor. It's not a factual issue. There's no genuine dispute of material fact on this because we also have to look at 1998 and 1999 when the rent did go up about 10% of fair market value. The trial court correctly held that that should have put LVOC on notice that rent could and did exceed 10% of fair market value. Even taking into account the alleged overpayment error in 1999, as the record reflects at page 846 of our appendix, even taking into account that overpayment and the reduction in rent in 1999, rent was still 1.14X of fair market value. LVOC offers a number of other justifications and potential ways rent was calculated without reference to the multiplier, such as this price per square footage concept concept on pages 44, excuse me, pages 34 and 35 of their opening brief. But there's no support in the record for any of that, that the parties calculated the rent using anything other than the multiplier. LVOC doesn't cite any record evidence for these alternative theories. The fact of the matter is the undisputed fact of the matter is that rent did exceed 10% of fair market value in 1998, 1999 and should have put LVOC on notice that there was an issue. The issue for purposes of the discovery rule, if the court ultimately holds that the discovery rule applies, is not just whether LVOC knew, it's whether LVOC should have known. And it's undisputed from the record evidence that LVOC should have known in 1998 and 1999. But even if the court looks further at it. What about King's testimony where he said that what is an overpayment due to an accounting error? Your Honor, even if that's accurate, that still would reflect that the true multiplier putting aside the overpayment issue was even higher than 1.14X, right? Because if they paid less in 1998, in 1999 than they did in 1998, the starting figure, taking into account the discount for the overpayment was higher than 1.14X. So even if there was an overpayment in rent, that doesn't change the analysis that LVOC should, knew or should have known in 1998 and 1999 that there was a problem. But even if you look ahead, even if the court looks ahead to 2009, it is undisputed again that LVOC's internal records reflect that there was, that LVOC believed there was the mistake in section 3.02 of the leaf that did not reflect the party's true intent. And that document is in the sealed record at page 8154. It's also page 48 to our appendix where Mr. King's internal talking points in sort of the third section of that, talk about how the return on the fair market value greater than 10% was not the intent of the party. So to some of the other questions that Mr. Rush was asked, it's not just Mr. King's belief that it didn't reflect the original intent of the party. He says right here in AA48, it was not the intent. And of course, Mr. King would know that since he was involved in the original negotiations. And so there's no genuine dispute of material facts that LVOC should have known no later than 1998, 1999 about the potential issues in section 3.02. And LVOC did know about those issues no later than 2009, which would mean even if the court adopts the discovery rule, and the date of that memo, by the way, is March 12th, 2009. That means that as of March 12th, 2019, any claims for reformation of the lease based on mutual mistake would be barred. Simply put, LVOC had plenty of warnings that would have put it on inquiry notice or given it actual notice as acknowledged by LVOC's own documents, that it knew there was a problem and yet it remained silent and did nothing. Turning to my second point, Your Honor, on the latches issue, the claim is also barred by latches because it's very, it's apparent from the record that there was a delay or lack of diligence by LVOC in discovering these issues, I'm sorry, in asserting these issues and or discovering these issues with the lease and LVOC's decision to remain silent caused the parties to suffer severe prejudice and change their course. First, as we've set forth in detail in our brief, important evidence has been lost. LVOC is wholly incapable of explaining, there's no genuine dispute of material fact. They've admitted this. Anything that's not in your briefs, you're repeating your briefs. Is there anything else you want to say? On latches, yes, Your Honor. I want to emphasize the reliance that LVOC's silence caused. This transaction closed as a result of LVOC's silence on the assumption that there was no error in the lease. Had LVOC raised a problem with the lease in 2017 or 2018, when the transaction was closing, the transaction may not have closed. It probably would not have closed. In fact, the testimony in the record was that the estoppel certificate was a conditioned precedent to the transaction closing. Did you present the estoppel certificate to LVOC? Not you personally, but your client. I believe, Your Honor, yes. I believe Mr. Texan sent a copy of the estoppel certificate to LVOC's condo association lawyer, asked that it be executed. There was some internal dissent at LVOC and LVOC's lawyer ultimately told them that the estoppel certificate needed to be signed. But we didn't mandate what LVOC put in that estoppel certificate. Article 17 of the lease requires an estoppel certificate to be delivered, but it says LVOC needs to speak on whether or not the six items listed in article 17 are true. And so it was certainly incumbent upon LVOC at that point to say, we can't sign this. There's a problem or to put in that estoppel certificate that they had a claim related to mutual mistake and reformation. They didn't and the transaction closed as a result. Had they raised that issue that could have been addressed at the time and maybe the outcome of the transaction would be very different. But as the court recognized in Excelsior Garage, the court cannot undo that closing at this point based on the estoppel certificate. So the estoppel certificate in article 17 says, here's what it should contain. And it says lease in full force and effect. It says five things and that mirrors what LVOC gave to you. You gave to them, they filled it out. I don't see anything in article 17 that says, hey, there's a problem. You need to flag it. It says you need to say the lease is in full force and effect. Everybody agrees it is. It says the term of the lease has been modified or amended. It had not been default. And then it says the term of the lease and the date to which rent is paid. And that's it.  Who says it's LVOC's obligation to put it in the estoppel certificate? Your Honor, the court's holding in Excelsior Garage says that. Excelsior Garage is very clear that based on the terms of this contract, we can't force LVOC to say what we want it to say. LVOC is free to put whatever it wants in its estoppel certificate about claims for monetary. You were the ones that set out what they had to say. So they had no obligation. You told them what to say, right? So why would they say anything other than what you told them? And they did exactly what you asked them to do. So you're saying you're criticizing them, based on another case, different situation, but you're criticizing them for doing what you asked them to do. And there isn't another sentence they were saying, and whatever. They gave you exactly what the agreement provided. So how can that be wrong? I don't care. That other case is a different situation. Under this situation, they comply. Why not? Your Honor, all of these authorities, all of the authorities that we've cited in our brief require the tenant, the person executing the estoppel certificate for the benefit of the landlord or the lender to investigate potential claims. It's on them to do so and to put those in the estoppel certificate. Otherwise, if the shoe were on the other foot, we would essentially have to give them a checklist of every potential cause of action under Illinois law. And to ask them to confirm that they don't have it. I mean, their position is they weren't aware of any. So it makes perfect sense that there wasn't anything there. And then you say, no, they should have known. So again, we go back to a question of fact that seems to be in controversy. You say one thing, Mr. Rush says the same thing as you, and then we have the appellate. Respectfully, Your Honor, there is no question of fact. All of the underlying facts are not in dispute. The rent did go above 10%. Let's see if that's conceded. Okay. I have a question. Generally, and it goes to. Any party who filed anything under seal. There was a ceiling in the trial court. And of course that goes again to the appellate court. But a judge not in our division entered an order that that continued, but having looked at everything, including your brief, which was filed under seal. Why at all? Shouldn't we just remove the seal? We don't have any objection to the court doing that. Assume all parties agree. We didn't want to put any tenants. I'm not blaming. I'm not blaming you. I just, I'm just asking the question. If it's okay with just, I would, I would ask just the other two parties. If they consent to, because much of this is really old business. Your honor, I would say, you know, we don't have any objection to that. Some of the reasons we did that was it was internal board minutes. I understand. I'm not. That's not my question.  I don't. I understand what I was doing. WP4 consents. Okay. How about the. Of course, your honor. We also consent to the. It'll make things easier for the decision to. Slate some of that. So we really appreciate it. And we understand why you did it. And you were perfectly within your confines and you actually, you're very good lawyers. You did what you're supposed to do. So thank you. Thank you, judge. And we appreciate that. If there are any other questions I can answer for the panel, I'm happy to do so. Well, if you could wrap it up, that would be great. Sure. I'll just be brief on my final point. Your honor, which is that there's no genuine disputed material. Fact that LBOC cannot meet its burden of proof on two essential elements of its claim. It cannot supply the missing contract term. It certainly cannot supply contemporaneous evidence of it. The closest LBOC got to supplying the missing term was at the hearing on the motion for the second hearing on the motion for summary judgment below. When Mr. Hogan explained how 36 years after execution of the lease, he would have implemented what he believed was the erroneously admitted or alleged erroneously admitted contract term. Mr. Hogan's or any counsel's suggestion about what to do 36 years later is irrelevant. It's really contemporaneous evidence that matters. And secondly, the mistake was the alleged mistake was not mutual. John Durso, the primary drafter of the lease for LHA. Roger Palsberg, the president of LHA shortly after execution of the lease. The lease, Pastor Abrahamson, who was a former LHA board chair. And Michael Renetsky, who was also a past president of the LHA board. Also, all testified that there was no mutual mistake in the lease. The denominator was never supposed to change regardless of how much square footage was developed. And for those reasons, there is no genuine disputed material fact that there was no mutuality in the alleged mistake. For all these reasons, we respectfully request that this court affirm the judgment to the trial court. Thank you, Mr. Kaspari, if you could keep it brief. Thank you, Justice Patinsky, and I will endeavor to do my best. I know that it's gotten late in the afternoon, so I will be very quick. Just a couple points I want to make. On the point about the estoppel certificates, the estoppel certificates were being procured to close the transaction by parties who knew that there was a potential dispute about the amount of rent. They chose not to include that in the estoppel certificates. It's completely unfair to say that LVOC should have known or should have put that in the estoppel certificates when they affirmed they chose not to do so. On the point of lashes, the trial court didn't address that. So I would say that if there is a question about lashes, that should be addressed by the trial court in the first instance. Turning to the March 2009 letter, I want to just briefly say that the 11.9% has absolutely nothing to do with the multiplier. It had to do with the amount of rent compared to the new FMV, fair market value, that LVOC had received from its evaluator. And so the 2009 letter from Mr. King cannot put LVOC on notice of a mistake in the lease. And finally, I just want to say briefly on the hiatus agreement. With the hiatus agreement, LVOC 4 seems to be trying to have its cake and eat it too. On the one hand, they want to foreclose our claim because we represented that the lease was in full force in effect and had not been modified. On the other hand, they point out a hiatus agreement that isn't listed as one of the amendments to it and clearly would have meant that Section 3.02 was not in full force in effect. At the end of the day, we don't think that there was a hiatus agreement. But at absolute worst, whether or not the hiatus agreement exists is a question of fact that should be resolved by the Supreme Court after this court vacates its summary judgment order and remands the trial. Unless there are any further questions, I will yield. One question. It's been said that there are no undisputed facts. Is that true? Not at all, Your Honor. There are more disputed facts. It would take me pages to list all the facts. But it was said that everything is undisputed. I think counsel was referring to specifically the fair market value in 1998 and 1999. We strongly dispute that rent exceeded 10% of fair market value because the moment that the Phase 2 units began being sold, that should have implicated the fair market value that was listed in the CHS ground lease increasing the fair market value. And there is a host of disagreement as to the proper operation of that. And it goes back to the mutual mistake that the parties made in 1989. Unless there are no further questions, Your Honors, thank you very much for your time and thank you for your consideration. Thank you very much for your excellent arguments this afternoon, your excellent briefs. We will take this matter under advisement and this court will issue an opinion or an order forthwith. In the meantime, this court is adjourned. Thank you. Thank you. Thank you.